Appellant by Thomas Patterson. Mr. Patterson, you may proceed. Good morning. Just for the record, with me is Mike Martin, my colleague and co-counsel, and my client representatives, Mr. Graff and Mr. Sackerville. Thank you. Welcome. May it please the Court in opposing counsel, on September 30, 2022, RE Land purchased for $27 million, 263 acres of real estate that had been annexed a couple of decades earlier to the village of Bolingbrook. At that real estate, two actions were being taken. One, it was quarrying activity, where you're digging the rock and stones out of the ground. And second, reclamation activity, where you are actually filling in some of the holes that are created when you mine with clean fill. Both of those actions are governed by state permits and state law and state statutes. The Surface Mining Act, the Pollution Control Board has exclusive jurisdiction over there. The trial court entered a preliminary injunction against RE Land on Counts 2 through 5 of the village of Bolingbrook's complaint. Count 2 alleged that we lacked a site permit. Count 3 alleged that we lacked a business license. And Counts 4 and 5 alleged that we had failed to comply with certain village ordinances with respect to the use of that land on the southwest corner. I'll take those in order. Count 2, the site permit. The village of Bolingbrook does have an ordinance that says if you move dirt around, you need a site development permit. We were moving dirt around. We did not get such a permit. Why? Four reasons. One, the state exclusively governs this area, not local ordinances. We cited the Will County v. Pollution Control Board, a case that was heard by this court and then affirmed by the Illinois Supreme Court, which so helped. In fact, the last concluding words of that court decision were that if Will County was unhappy with what the Pollution Control Board could do, they could petition the legislature or they could petition the Pollution Control Board itself. The court never said, hey, just make your own groundwater ordinances and you can enforce them. The state has the responsibility to govern quarrying and reclamation activities. Second, the village of Bolingbrook's own ordinance, Section 12.1, I believe, which we cite on page 15 of our opening brief, says that where the state exclusively governs something, the village ordinances will not apply. So that is this case in particular. Third, village of Bolingbrook admissions. At this hearing, Mr. Eastman, the key witness for the village of Bolingbrook, stated that reclamation was governed by the state. And we set forth some of his testimony at page 16 of our opening brief. In additional testimony, in page 4 of our reply brief, and the page 4 testimony of the reply brief was notable because that was in response to questions by the court. If there's dirt moving activity, Mr. Eastman said, the state governs it and he does not. Finally, before we purchased this property, on September 9, 2022, the village of Bolingbrook sent us a zoning clearance letter, in which paragraph 8 states that this property is not subject to a site development permit. We set that forth on pages 8 and 9 of our opening brief. The village responds that, well, we waived it. We waived it. But the standard for waiver is do the pleadings reasonably inform someone of what your contentions are? That's what the standard is. And I submit that if you look at the answer to paragraphs 5, 12, 13, 15, and the other paragraphs that we listed in our reply brief, that you will see that, A, we admitted we did not have a site development permit from the village of Bolingbrook. B, we denied that we needed to get a site development permit from the village of Bolingbrook. And C, that we were operating pursuant to state licenses, the CCDD permits, the NPDES permit, and the Ross Air Discharge Permit. So for all of those reasons, we did not waive this issue of whether the state exclusively governs this permitting process. Second, they cite the Northfield case in saying, well, you can have the state regulated and the municipality regulated. But in Northfield, they were talking about a reclamation action. Yeah, I mean, sorry. They were talking about recycling. Excuse me. I'm having a senior moment there. Sorry. And they were talking about recycling. And they noted that it was extremely dangerous, a huge risk of fire there. But they said that the landowner there had violated an agreement he had made with the municipality. And then it's right in the opinion, which says they said, look, the landowner promised not to operate unless he had a permit. And so they said, well, so how does this injunction hurt you? And they say, right, the landowner's attorney was silent in that response. So clearly in that situation, the fact that they insisted on a license had no bearing on it. So therefore, as a matter of law, the count two ruling on a site development permit should be overturned. Third, business licenses. We cited the Hoyt case, which says, look, if you just haven't applied for a license, you can get fined until you get one. But unless there's a substantive violation of some ordinance, we're not going to enter a preliminary injunction shutting your whole operation down. They cite the Riverdale Allied Waste case, which is totally inapposite and not on point. And we cited the Riverdale versus American Transloading case, which considered the prior Riverdale case and said, no, no, no. The mere fact that you don't have a license by itself will not justify an injunction to shut your operation down. And I would refer again to the Village of Bollingbrook's own ordinance, which says if you're licensed by the state, you don't have to worry about the Village of Bollingbrook ordinances. Okay, then we have counts four and five. There are four issues presented in those two counts of the complaint. And there's two points about them. One, the evidence was insufficient to support them. And second, reliance on those ordinances barred by the annexation agreement as a matter of law. A little bit additional background. Before we purchased this property in 2022, H&H Stone owned it. And they were conducting quarrying and reclamation activities on it pursuant to state permits. They removed 20 feet of the 30-foot berm that surrounded the key part of this quarry. And they used it to reclaim and fill in the southwest corner of this property. They started with 10 acres. They expanded it to 12. Then they expanded it to 20. They had 20 feet of fill that they had put in the southwest corner before we purchased the property. We purchased the property. We asked them to continue pursuant to a short-term lease their quarrying and their reclamation activities. And they did so pursuant to the short-term lease using subcontractors. And they continued to fill in and reclaim that area that they had previously done. And they capped it with limestone filings and compacted asphalt filings on top, 10 inches of that. The Village of Bolingbroke states that they added 3 feet to this level. I don't think that's actually accurate. What they did was they did the pitch for that southwest corner so that it complied with the drainage standards of the state. It needed a 1% pitch, and they did that. And the compacted asphalt filings control dust, control erosion, and permit adequate drainage, all pursuant to these state permits. So, we had these compacted asphalt filings on the southwest corner. Now, when RE Land took over, they parked trucks, trackers, and semi-trailers on that 20 acres. There's four issues then. One, they say it was dusty. Two, they say we didn't have lights. Three, they say we didn't have curbs. And four, they said we didn't have a fire suppression plant. The ordinance said, I want to consider just the evidence on these ordinances taken by itself without regard to the annexation agreement for the moment. There was no observation by the Village of Bolingbroke, no video by the Village of Bolingbroke, no test by the Village of Bolingbroke that showed that dust emanated from this compacted asphalt filings. None whatsoever. They could have inspected it pursuant to their police power. They could have videotaped it pursuant to discovery rules. They could have had an expert out there to test it. They did nothing of that kind. The long-standing rule is that evidence, that ordinance interpretation favors the free use of land. The landowner, the entrepreneur, the business person. That's who it favors. We didn't have dust coming from the compacted asphalt filings. It's hard to see how you could. Nevertheless, we didn't. So, we showed that there was... It's their burden to show the injunction that it was not a dust-free surface. Right. Yes, sir. So, you don't need to talk about what you think you didn't do. You're right, Judge. But what I'm saying, what I was trying to say is that they didn't do any videotaping, any testing, any observation to meet their burden of proof with respect to the fact that it was dusty. It wasn't. The IEPA was out there, and they said there was no dust from this parking area, the 20 acres of compacted asphalt filings. Mrs. Zacheroff testified that there was no dust coming from that area. One of the neighbors on the west side of the street said that there was dust from the area. But she said, and this is at page 585, I believe, for the record, for some reason I remember the page number, that it was from the trucks going on a gravel parking lot. It's undisputed that the area in dispute here is compacted asphalt filings, not gravel. So, there's no competent evidence with respect to that either. If we allow the village of Bolingbroke, whose development person just said, well, dust-free surfaces means it must be pavers, it must be concrete, it must be asphalt. You don't have a government of ordinances, you have a government of individuals saying what these things mean. And there's no certainty for business people to rely upon. You should be able to allow to read that ordinance and say, as long as I have a dust-free surface, I'm in compliance. We could put steel surface down, but under Mr. Eastman's testimony, that would be forbidden. We could have an astroturf surface down, as long as it wasn't dusty. Under Mr. Eastman's testimony, you couldn't. We didn't do an astroturf surface. I'm not saying we would. We couldn't under the state permit, but what I'm saying is the ordinance just says dust-free. It doesn't say pavers, concrete, or asphalt. We were allowed to do compacted asphalt filings, and as long as it wasn't dusty, that should be permitted. Second, they said we didn't have curbs. Now, they didn't really include this in their complaint, so I don't think it was particularly that important. But nevertheless, it came up at the trial, and it was part of the judge's ruling. I'm not going to run away from it. Typical curbing is those 6-inch curbs that you see at grocery store parking lots. We had Jersey barriers that are 24- or 30-inch high things that you see along highways. The trucks come in, and they plop them down. They're heavy enough. They're temporary. You can lift them back up again if you want to, but they're heavy enough, and they provided a continuous barrier. And no one denies that. You can look at Plaintiff's Exhibit No. 9 and see the picture of the trucks parked there, and you'll see the Jersey barriers around the edge and in between the trucks. What's the purpose of curbing? And you're saying that curbing, in this case, was Jersey barriers. Yes, sir. What's the purpose? The purpose is to separate where you can park from where you can't park and to designate stops. Third, lights. If you look at paragraph 63 of this complaint, they have the ordinance that they set forth. They say that for truck parking, they have minimum lighting requirements and maximum lighting requirements. In paragraph 63, you'll see the ordinance for truck parking, there is no minimum. There is no minimum lighting requirement. So we didn't have lights on the property. There's no dispute about that. We don't have the lights there. So we obviously don't violate the maximum lighting requirement, but there is no minimum requirement. Mr. Patterson, can I ask you to go back to the business license issue for a moment? Sure. You point out cases that say that if there's a business license violation, you don't issue an injunction. But are you conceding that this is a situation where they should have sought a business license? No, Your Honor. Respectfully, no. Only because of a couple of reasons. One, it's governed by the state, and we have the state license. Well, the state doesn't govern truck parking businesses. This is something that was – I mean, setting aside the precision truck parking, which was much more minimal, I mean, the state doesn't govern hundreds of trucks being parked in a particular location. They don't regulate that type of a business. Yeah. Is that fair? It's interesting that the state doesn't discuss truck parking in their reclamation or in their mining. Well, presumably, there's going to be some truck parking relevant to that business. But you're not sitting here telling us that all these trucks were related to that business. This was a separate business to make money to help make this property. That's exactly right. So why isn't the city entitled to require a license to regulate that? Well, if they are required to issue a license to regulate it, it would be a business license just saying that we're doing business here. It wouldn't be a substantive effort, and they wouldn't be permitted to prevent the truck parking. And I'm accepting those cases. I'm asking you whether you're conceding that they are required to get a license. I think that if it's not futile, we could be asked to get a license, even though I would point out that H&H Stone never had a license. Well, slightly different level of trucking, I suppose. Maybe a different level, Your Honor, and I accept that. But the fact is that H&H Stone did have these parking areas based on reclaimed land before. They did park not only the quarrying trucks and dump trucks and so forth there, but they also had strangers park there. And with respect to the dairy parcel that's south of 135th Street that was part of the original annexed land, H&H reclaimed that area because that was previously a quarry also. And they had parking areas there based on the reclamation, and they parked strangers' trucks there with no problem and no license. And that was known by the village of Bolingbroke. It was known by us before we took over. So in my view, it's selective and fortunate to say we have to have a business license. But I understand your point. It would be a non-issue if they would issue the business trucking license. What's the harm in getting one? But to apply for one when you know you're not going to get it, it seems to be self-defeating. Does that make sense? Just a quick question. Yeah. Isn't that what the village says needed to be done? And for their version of what was put on that property, you start off with a development permit, not a business license. It's a whole separate issue. It's interesting. And you're correct. That was count one of their complaint. But they lost on that count. The trial judge did not award them the injunction based on count one of the complaint, which alleged the site development permit was required. No site development was required, said the court, because of the annexation agreement. It said that there was not the annexation agreement. You didn't have development or construction within the definition of the annexation agreement, such that this ordinance or the other ordinances would be required to comply with. Your time is up. I see that. And you will have time in replying with the further questions from the court. That's fine. Thank you. Did I answer your? Thank you. All right. Thank you. Thank you. Mr. Wilder, you may respond. May it please the court, counsel. I'm here also with my partner, Michael McGrath. It's well established that the standard of review, and I think it's important in this case, for preliminary injunction orders is abuse of discretion. And a court abuses its discretion when its decision is mandatory. May I ask you, Mr. Wilder, to speak up a little bit? Sure. These don't amplify, but they're primarily for the court. A court abuses its discretion when its decision is arbitrary, fanciful, or when no reasonable person would take the same view. Additionally, where the trial court has made determinations of fact, and there's no question that the trial court in this case did, in fact, make determinations of fact, the standard is that those determinations is manifest weight of the evidence. The injunctive order entered by Judge Anderson in this case relies on credibility determinations in no small part also. And finally, it's important to keep in mind that although there was a four-day evidentiary hearing and significant discovery preceding that, this is not a final determination on the merits. This is a preliminary injunction. May I ask a question about that, Mr. Wilder? I know everyone's talking about this as a preliminary injunction. I'm having a hard time figuring out what else the trial court could order after a hearing on this goes forward. I mean, not only did they stop the trucking business, but they ordered the development or improvement or whatever you want to call it, reclamation, undone. What else could the court possibly have done? And I ask this question because with injunctions, we look to the essence of what's ordered, and this seems very permanent to me. It doesn't seem preliminary. Well, there was an opportunity given to RE-LAM to appeal it, and the trial court stated the enforcement of the— No 304-A order. No 304-A, but this would resolve all five counts on a preliminary basis. We could go back, and there would be more evidence. I'm just asking, is there anything else the village wants that it didn't get in this quote-unquote preliminary injunction? I would go back and introduce additional, more substantive evidence as to count one to ensure that that— You're talking about the remedy that was ordered. Is there anything else that you would be requesting? No, no. In a sense, you're correct. It is virtually all the relief we were asking for, but, again, we could have a full trial and have other witnesses that the defense could introduce to change the outcome of the case. So, again, it was a thorough hearing, and it did, in fact, address four of the counts, but it is not a final determination on the merits, and there could be more to be done. But, in any event, the standard is that the village need only establish a likelihood of success on the merits, and we absolutely did that. The defendant's argument that this injunction order involves questions of law and should be reviewed de novo has no merit. Not one single aspect of this injunction order is subject to de novo review. There's a long line of cases cited in the village brief that holds that courts should defer to municipalities' interpretation of its own ordinances. Those cases hold that because agencies can make informed judgments on the issues based on their experience and expertise, it is generally recognized that courts will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute. So, the trial court determined... Who's the agency here? The agency would be the zoning administrator of the village of Bloomingbrook. He enforces the zoning code. The zoning code requires what's called an all-weather dust-free surface. So this is Mr. Eastman? Mr. Eastman has interpreted that, and it has always been interpreted by the village to mean, and he testified to this, and Judge gave him credit as a credible witness that that means hot asphalt, concrete, or brick. And Judge Anderson was deferential to that determination, and he was authorized to do that by that long line of cases that explains that. So, I use the word agency. Most of the case law relates to state administrative agencies, but there is also case law that brings that. What was the evidence that this was a dusty area? Well, I would just say there was evidence, but we did not need to present evidence of it because the definitions, the interpretation of the statute was hot asphalt. What does the statute say, apart from Mr. Eastman's interpretation? It requires an all-weather dust-free surface. That's the language of the ordinance. The interpretation that Mr. Eastman has provided, and it always followed, and it's true when you go anywhere in Bolingbrook, you do not see graveled driveways, you do not see graveled parking lots. It has always been interpreted that way. And that should be afforded weight and deference. And Judge Anderson agreed with it. So, is there an ordinance in Bolingbrook that says every driveway has to be asphalt, or it has to be concrete, or does the ordinance say dust-free? It literally says all-weather dust-free.  All-weather dust-free. Yes. But the interpretation that Mr. Eastman provided and testified to and the trial court credited is that there's a meaning to that, which is hot asphalt, concrete, or brick. The evidence that there was dust. Let's say you were a steel magnate and lived in Bolingbrook, and you decided you just had some rolled steel just to put on your driveway. That would not be sufficient? Rolled steel as a paving surface? Yeah. It's all-weather, is it not? Probably it would. It probably would. It might. I think that would be something that would need to be studied. I've never heard of a rolled steel paving surface. But you learn something new every day. But in any event, although a court is not bound by the agency's interpretation, the court is not justified in reversing the decision merely because it would have interpreted the statute differently. The question is whether the agency charged with the statute's administration came to a reasonable interpretation based on a permissible construction of the statute. And there's no question that Mr. Eastman's interpretation of Section 54-533 is both reasonable and permissible. Substantively, Mr. Patterson talked a lot about preemption. And in the village's brief, I talked a lot about preemption as an affirmative defense. Defendant did not plead preemption as an affirmative defense, and it was waived. What the defendant really asserted in the proceedings below is not preemption, but the activity conducted at the property in November and December of 2022 was not the creation of an improvement at the property, but simply reclamation. And therefore, it was permitted by the annexation agreement and the special use permit, both of which allow quarrying and quarrying-related activities. But the trial court rejected that argument, and incorrectly so. The trial court specifically determined that the activity of November and December of 2022 was not reclamation, it was the creation of an improvement, and that was based on credibility determinations. The trial court specifically found that the defendant was hiding behind the special use permit and annexation agreement while it was in reality creating an improvement, which was this massive truck parking lot. And there are photos in the record that show and depict this parking lot, which is capable of supporting approximately 500 over-the-road semi-trucks. Moreover, substantively in regard to preemption, as I explained in the village's brief, preemption only exists when compliance with two sets of laws is physically impossible. But since preemption is an affirmative defense, it's the defendant's burden to show this. And the defendant did not even attempt to make such a showing. So accordingly, this newly raised preemption argument is both procedurally untimely and substantively without merit. Next, the site development. That's count three of the complaint. Site development permit. So count one was a development permit, which has different standards, and the court rejected that. Site development permit is based on statutes in the village. Site development by the village is defined as altering terrain or vegetation and constructing improvements. And it requires a site development permit when any person engages in any land-disturbing activity, i.e. clearing, grading, stripping, excavation, fill, or any combination thereof that will affect an area in excess of 5,000 feet. So you agree certain aspects of activity that would fall within that definition were permitted subject to the annexation agreement and subject to these meetings that were had before. And if it didn't cross a threshold, for lack of a better way of putting it... That's a way to... Let me just finish the question. It would not require a site development permit, even though it might otherwise fall within the ambit of that definition? That's correct. So who decides what's too much? It goes to the breadth of the project and the purpose of the project. Previously, the owner, who owned it for nine years, put dirt in that area in a very generic, gradual manner and just put it there for no purpose other than to build up the surface and create a generic flat surface. It didn't serve any purpose, and to the extent it served a purpose, it was so that later somebody could do something with it. He didn't care what it would be. But what was happening here was a massive acceleration of activity, and it was purposeful. They built an improvement. They built a truck parking lot. And so that's when it crosses the threshold. So is it the activity itself and what's happening, or is it the intent and how it's going to be used? It's largely the intent. So this would be okay if they didn't have a trucking business? You'd be okay with the improvements? Absolutely. Because they were building something that had standards. But they built what they built that had standards, as you characterize it, but they never did a trucking business. Would Bolingbroke have a problem with it? If they just added dirt to that area, Bolingbroke would not. Let's say they did everything they did. Except what, though? But then did not have a trucking business. That would be reclamation because the intent was to build something and to create it, and the trial court said that. They created an improvement. This is an improvement to the property. And when you have an improvement to the property, it triggers the annexation agreement and special use permit, which requires the owner to comply with all building codes. Once you create and add an improvement, you are stepping outside of what you're permitted to do under the annexation. Where is the line between improvement and reclamation? The creation of an improvement. And just so I'm clear, part of what you say triggers the need for the permit is not only the improvement, but your intent as to how you're going to use the improvement. It's a combination of the intent and the ultimate creation of the improvement. The intent to create the improvement and the actual creation of the improvement. So it's the process and the result. Correct. I want to talk about that. And again, the determination is made by Mr. Eastman? Mr. Eastman, yes, and the court made a credibility determination when he listened to Mr. Eastman's testimony. You see, I'm starting to run out of time, so I want to focus on the business license aspect of it because the case of Riverdale v. Allied Waste, unequivocally holds that the failure to obtain a business license standing alone can be the basis for injunctive relief pursuant to 1113-15 of the municipal code. As noted in that case, it's particularly true when obtaining a business license requires compliance with all other municipal codes. And therefore, the business license requirement directly promotes public health and safety and is not merely a ministerial formality. Defendant's reliance and citation to the other later Riverdale case, American Transloading, is entirely different and it does not undermine or contradict the previous Riverdale case. In that case, the court absolutely agreed unequivocally, careful reading of it, it's right in there, that a preliminary injunction may issue when a business fails to obtain a business license. But in that case, the trial court failed to balance the hardships as it was required to do. That case has no application here because the trial court did in fact balance the equities and did so in a thoughtful and careful manner and found that the hardships favored the village. I also add that in the American Transloading case, the second Riverdale case, the reason that the business licenses were denied is because of unpaid taxes. It was not due to a failure to comply with other municipal codes. So the business license requirement does in fact create a filter for businesses and individuals who are not in compliance with other code provisions and that in this case would be site development permit and the surface. And I want to talk a little bit, I actually have the time, so if I could just make my concluding remarks, Judge. The trial court here performed a thoughtful, careful, diligent analysis. It's not an injunction. I'm sure you see these from time to time that are entered after 30 minutes of legal argument or based on affidavits of parties. This is an injunction that was based on four days of testimony, all done after a significant discovery. The village presented a fulsome case and the defendant put on a vigorous defense and the trial court's decision relied in no small part on the credibility of witnesses. This section of the municipal code, 1113-15, exists precisely for these circumstances and gives municipalities a powerful tool to shut down scoff laws like the defendant. The village clearly demonstrated a likelihood on the merits on counts two through five, and Judge Anderson's decision was correct and the village respectfully asks that this court affirm that injunction order. Thank you very much. Questions? I have no more. Thank you. Thank you. Thank you. Mr. Patterson, you may reply. Thank you again, Your Honors. Mr. Patterson, can I just ask you this question that I raised as it relates to the essence of the injunction and whether it's permanent or preliminary? As you know, our jurisdiction is under 307-A1, which doesn't apply if it's in essence a permanent injunction, and I'm having a hard time viewing this as anything other than permanent given what the court's ordered. Yeah. If you look at our main brief, the prayer for relief is probably the longest prayer for relief I've ever written, and it has cumulative and independent bases for relief. So it really depends on what the ruling is. If the ruling is, as a matter of law, for example, that the site development permit is preempted by state law and that the business licenses isn't the basis for a preliminary injunction, and that the annexation agreement bars enforcement of the ordinances of the Village of Bolingbroke, those are questions of law, and that would end the matter, as far as I can tell, practically speaking. But in some respects, and I understand what you're arguing, and I appreciate it, but it's putting the carpet before the horse. Our jurisdiction doesn't lie if what the trial court ordered was in essence a permanent injunction. We wouldn't get to those interesting questions. I think that I would fall back on the black-letter law principle that the court has jurisdiction to determine jurisdiction. If the court, for example, affirms the injunction on the basis that they failed to meet the burden of proof, then they would get a chance to try again at the permanent hearing. And then if the court said, well, they met the burden of proof by the skin of their teeth, then we would go back and recruit additional witnesses who are at certain meetings and show that, in fact, they cannot meet the burden of proof. So does that... I hope that answers... So in other words, there are aspects that could go back to the trial court for a final trial. Well, either way, there's aspects that are going to go back if you haven't had your final hearing, ultimately, right? Yes, yes. But it's not... I don't think... Depending on... Look, if the court rules, as I said, as a matter of law, this injunction was improper, not just on the burden of proof, but on the interpretation of the ordinances and the interpretation of the annexation agreement. And I think, as a practical matter, there might be some cleanup things to do in a final hearing, but as a practical matter, I think the case would be over and we wouldn't be back up here again. But if we're just talking about different burdens of proof, even though the burden of proof is a question of law, if they didn't meet it, they might get another chance to meet it. And so would we. I don't know. If you want a supplemental brief, we could discuss that. That's something we may discuss, but I don't want to interrupt the remainder of your rebuttal, please. Yeah. Okay. Thanks. So I think we've adequately briefed the idea of what's de novo and what's manifest weight, and so I'm not going to touch on that, even though I disagree with what Mr. Wilder said, that everything here is a manifest weight standard. I think there are questions of law here as well. I left off last time where I was getting ready to talk about the fire suppression, which was part of Council 4 and 5 and was part of the basis of the judge's ruling. He said we didn't have a fire suppression plan. And this goes to the jurisdiction question as well, because we had a fire engineer testify that our fire suppression plan was safe and that there was a minimal risk of fire in the 20 acres that were used to park trucks. And the opposition witness was the fire chief, and I appreciate his candor. He admitted that he was not a fire engineer, and he lacked the competence to judge a fire suppression plan, and that he said that if somebody submitted a fire suppression plan, he would engage an engineer to analyze it and then discuss it on behalf of the village. So it seems to me we have the only competent evidence of whether this fire suppression plan is good or not. So it's a minimal risk, and we've got a fire suppression plan. We've got fire extinguishers. We've got water. We've got everything that you could want out there. They argue at page 30 of their response that, well, if you had an apartment building that had never had a fire, nevertheless you need a sprinkler system. And I want to turn that analogy on its head, because here we have the equivalent of a fire sprinkler system, and they're claiming that, well, we didn't submit the piece of paper explaining it. And then they evict all the tenants because we didn't have the piece of paper, when the substantive safety aspects of this are fine, and there's no evidence to contradict that. So in my view, that is the essence of the failure of the burden of proof which relates to jurisdiction and so forth. If they want to have a fire engineer come in and testify, I suppose they could at the final trial of the merits. So I've missed out on the annexation agreement. I'll rely on what was said in our briefs. We've also attacked the standardless preliminary injunction that was entered by the trial court, and we'll stand on our briefs on that. I thank you very much for your attention and your questions. Thank you, Counsel Bogle, for your arguments in this matter. The Senate, this morning, it will be taken under advisement and a written disposition shall issue for a standardly recess for penalty.